Thank you, Your Honor. Good morning. May it please the Court. Alexander Robbins on behalf of the United States. I would like to reserve five minutes of my time for rebuttal, but that's aspirational, I realize, and I will watch my clock. Okay. Very well. Your Honors, the Selective Prosecution Standard is very hard to meet. It's a rigorous standard, it's a demanding standard, and it's one that's been met only once in the history of this case, in 1972, in the Steele case. And this case, Your Honors, is nothing like the Steele case. In this case, the District Court made fundamental errors with respect to both of the two Selective Prosecution requirements. On discriminatory effects, the District Court used as a comparison group three individuals who are not similarly situated to the two defendants in this case, and certainly not similarly situated in all relevant respects, which the parties agree is the standard. And with respect to discriminatory intent, the District Court really turned the separation of powers analysis from Armstrong on his head by starting from the proposition that the government was acting unlawfully, and then rejecting government's explanations for its charging decisions, because the District Judge strongly disagreed with those explanations as a matter of policy. Counsel, before we get to that, which is the big case, a big part of this case, the comparators, as you know, our circuit has, at least as Culleton relates it, said that either we review for, review de novo, or we review based on clear error. What's the position of the government on the appropriate standard of review in this case? The position, we set it out probably in more detail in our brief, but I'll be happy to sort of jump into it. This is reviewed de novo, and Culleton identifies sort of the overall question as an open issue, which comes after the Wilson case that the defense relies on. I don't think it matters, and I have an example of why it doesn't matter. If you say, again, from the backdrop that the historical on-the-ground facts are reviewed for clear error, ultimate legal conclusions on elements or prongs are reviewed de novo, if you start with the example of similarly situated, you could say, well, the district court's decision that these defendants were similarly situated to the three named individuals, that's reviewed de novo. If you want to say that's reviewed for clear error, even though it's not really a factual finding, then the fact that they, based on the historical on-the-ground facts, were not similarly situated, because they had different criminal histories, for example, they did different things, that would make it illogical under NGSA. Let me ask you something. When you said historical facts, don't, you know, it's traditional, at least as I think about these kinds of issues, that when there's historical facts, we always review factual, historical factual determinations for clear error, right? Correct. That's generally what we do. Yes, Your Honor. And then the ultimate conclusion is reviewed de novo. In other words, do those historical facts support the ultimate determination, which were reviewed de novo? Yes, Your Honor. Isn't that really kind of the way we should approach this? And if we made it clear, wouldn't it be beneficial to the district courts to understand that if they're going to make factual findings, they're going to have to be based on, you know, good evidence? I think, Your Honor, we yes, I mean, we set that forth in our brief. I don't think, in my answer to Judge Smith's question, I'm not sure it matters how you dice it, because it becomes something of a language game, depending on what level you're looking at. But Judge Payaz, that's the position we set forth in our brief, historical facts versus ultimate legal conclusions. That's the background rule. We don't think there's any reason to depart from that here. What do you think Judge Carney was up to here? I can only tell you, Your Honor, what was based on the record. But from the record, it was very clear that Judge Carney strongly disagreed with the government's policy-based charging decision. Well, no, I guess I should only be clear. Was he making factual findings, or was he just sort of ruminating about, you know, what happened and from his perspective? He did both. He did both, Judge Payaz. What was he doing? There was no evidentiary hearing, right? There was, you know, the, well, I may be mixing my bail hearing with my merits hearing. There wasn't on the dismissal prong, I don't think, but there was an evidentiary hearing on the bail issue. I'm only concerned about... I know. If somebody briefs this case, I might be getting them mixed up. I'm only concerned about the merits of the dismissal. But, Judge Payaz... There was no evidentiary hearing for that, was there? Correct. He just looked at all the submissions and wrote his order and said, this adds up to selective... Correct. But under the... Selective prosecution. Under the clear error standard, you don't need an evidentiary hearing. And this comes up in other cases. Right, I understand that. Well, the government is aptly, you know, the district court can make factual findings on a paper record. And so, for example, the three individuals, JMA, JA, and JF, the district court thought they were members of ANTIFA. We, it's actually not clear whether they were, but we're not contesting that because that sounds in a factual finding. That's a historical fact issue, a basic fact. So, we're not challenging that. Is it the position of the government that only those three individuals are anywhere in the ballpark of appropriate comparator? Correct. In other words, the three other people mentioned are a different time, different place, different... Some of them predated the events here. The reference to the groups doesn't comply with our case law, right? Yes, Your Honor, that's correct. It doesn't. JM, JT, and one other one that are theoretically in the universe that fits in our case law. Is that the government's position? Yes, Your Honor. The defense came up with 13 individual comparators. The government pointed out in the district court that only three of those people were actually committed any riotous acts in this district. And so, the district court then went to those three, and that was the basis for its comparison group, which was wrong because we set this out in a brief, but it's worth noting here that those three individuals were, first of all, it's not even clear whether they violated the Anti-Riot Act because there's no evidence of an electronic interstate communication that was not just that happened before the riot, but that was tethered to in furtherance of the riot, which this court requires and required in its last decision in this case. Even if there were, though, the strength of the evidence is completely different. The organization and effectiveness, the multiple rallies they went to with co-conspirators who engaged in other riots, such as Benjamin Daley, and their criminal histories. So, just off the bat, six significant differences. And the standard is similarly situated in all relevant respects. And mention is made in the briefs of a Ms. Falarca, but I gather that was not a basis of the district court's decision, and so we can just put that to one side, correct? I apologize, Judge Tiger. I missed the first part of your question. I couldn't quite hear it. Mention is made in the briefs of a Ms. Falarca. I'm saying that from memory. I might not have it exactly right. But my question is, she doesn't appear in the record before the district court, so we can put that to one side. Isn't that right? I think there might have been some stray references to her in the record. Yvette Falarca, the teacher activist from Berkeley, the references in the record, and we put this in our reply brief, were actually her as a potential victim, and she might have been someone that the defendants were referring to after the fact from the Berkeley rally. The news articles that the defense submitted discussed her a lot, and so to the extent that she's in the record, she's in the record primarily as a potential victim and also as a rioting activist from news articles. But the judge didn't name her. Correct. The judge did not name her as one of the comparators. And she's also just obviously not. She didn't commit any riot acts that we know of, at least, at the rallies the defendants were present at in this case. I'm just going to say, so with respect to the charge here, the federal charge, there was a – in part of Judge Carney's order, he talks about there being some communication between these individuals. Yes. And then he says, well, from that we can infer that they used interstate wires. Yes, Your Honor. Is that correct? Is that a proper inference? No. And that's the one instance, and I think we say this in our reply brief too, that's the one instance where I think we are targeting a potential historical, real factual finding of the district court as clearly erroneous, because the district court literally says, I'm going to assume that they used the Internet to communicate, to show up at this rally ahead of time. That is literally – it's a non-sect order. It's literally illogical under the Hankson standard. But it also – even that wouldn't get you there, because remember the Anti-Riot Act use of interstate facilities, including text, email, has to be in furtherance of the riotous act. So if we all agree to go to a rally, that by itself is not a violation of the Anti-Riot Act. If we agree to go to a rally so that we can riot, then you do have that necessary interstate communication. What if you add in the – I think – I forget which one – one of the three that it was who had goggles. He had a mask. He had a headband, I think. Yes, Your Honor. Dressed in all black. Couldn't you – I mean one doesn't think of going to a rally dressed like that unless, you know, got some other ideas, you know, that are motivating you. I mean so couldn't Judge Carney say take that and then take this communication and say, well, you know, we could reasonably infer that they went there for the purposes of engaging in – We are not – we are not disputing that these were bad actors who showed up, as Your Honor suggested, with weapons and apparently ready to riot. We're pointing out that there is zero evidence that the – first of all, there's zero evidence of an actual interstate communication, electronic communication, period, just to mention the police report that they coordinated to go to the rally together. And there's certainly no evidence that they – that that communication was in furtherance of the riot. Again, these individuals were arrested for rioting at these riots. That's not the issue. But, no, if we came to Judge Carney with a complaint and said there's probable cause to charge these people when we don't have evidence of one of the elements, we'd get laughed out of court or Rule 29 after a trial. And even – It seems to me that part of what we need to look at here is even though you have these three individuals and the teacher who showed up at these things dressed as my colleague has pointed out, the reality is you've got to prove beyond a reasonable doubt that each element of the riot act has been violated and you don't come close to that. Whereas in the case of the defendants here, arguably, they actually put all their evidence, their own evidence up on the internet bragging about what they did, the preparation and the like. I take it that the government also views the fact that the evidence in this case produced by the defendants themselves really changes what we look at as a comparator. Is that correct? Absolutely. And because the strength of the evidence is a very important, as your honors are aware, a very important prosecutorial consideration. We can't prosecute all the federal crimes that occur. Strength of the evidence is a major factor in our charging decisions. It's a factor that the Supreme Court discusses in the Waite case at some length. And if you actually read sort of the Waite case with the Steele case, Waite makes clear that sort of the strength of the evidence, the low-hanging fruit sort of logic, that is a completely legitimate basis for bringing a prosecution against person A but not person B because we have better evidence on them. And here, as your honor pointed out, Judge Smith, it's not even close. Let me ask you this. You're down to two minutes and 35 seconds. Thank you. Do you want to save any of that time? I would love to save that amount of time. Yes, please. Obviously, my colleagues can ask as many questions as they want, whatever the time says, but if you want to save that for another time. I appreciate the heads-up, Judge Smith. Thank you. So let's then hear Ms. Platt, please. Good morning. Good morning. Thank you very much, your honors. My name is Caroline Platt from the Office of the Federal Public Defender with my colleague Aaron Murphy on behalf of Robert Rundo, and this morning I'm arguing for both employees. Just to address the standard of review question briefly, I think Judge Paez and Judge Smith and Judge Hager, you addressed it, have nailed it because it's de novo for legal conclusions and clear error for facts. Why? We have a variety of cases. One says that we've kind of conflicted on it, and yet as you go back and look at it, it seems like they favor clear error. What's your best argument as to what we should do in this case? Sure. And I think the best case for that, your honor, is Wilson, and there are further future cases that note that the – That's a really, really, really old case, right? Right. And the later cases note that the circuit split that other cases have discussed is illusory because it has to do with the standard for review of discovery order selective prosecution cases versus this, a merits case. And we think that also there are other circuits that also have agreed that it's clear error, the sixth and the eighth.  But multiple courts have agreed that it's clear error on the basis that Judge Paya has identified, which is that whether there is discriminatory effect on the appellees is a factual finding, and whether there was discriminatory intent by the United States government is also a factual finding. Let me ask you this, since this all deals with evidence, if we go with clear error. There's, of course, selective enforcement, which Judge Wynn dealt with in a recent case in terms of what discovery could be done versus selective prosecution. You selected selective prosecution. What evidentiary demands did you make of the government that the district court denied, if any? The hearing on the discovery request and the merits request was the same hearing. So we asked for both things at the same time, and the court granted the motion on the merits and therefore didn't address the discovery request. And it was an argument hearing, not an evidentiary hearing, as my colleague from the Department of Justice said, on the motion to dismiss on February 21st of this year. But did you ask the government for any evidence based on whatever hearing or argument that you did not get? Yes. Prior to the hearing, my district court colleagues sent a letter requesting selective prosecution discovery to the government, and that got wrapped up in the motion to dismiss, which in the alternative requested discovery. And you sent the letter, and that asked for, obviously there may be a lot into it, but basically what did you ask for? Evidence of, I believe, the letter, by the way, is in the record. I can't remember. I think it's in the SERs rather than the ERs, but it is in the excerpts of records at this court, not just the district court record. So we asked for, it's sort of what our office tends to ask for in any case where we think there may be selective prosecution issues to be discovered. And what, if anything, did you receive in return? I believe the answer is nothing. What? Nothing. Nothing, okay. Yeah. So, Your Honors, to the factual point. But you were able to put together some sort of showing to the district court. Yes. He addresses it in the order. When we did the first, when Judge Tiger and I were on the first panel, we only dealt with the constitutional challenge to the statute. The First Amendment, that's right. And so this all happened after the remand from this court at the first panel. And so what we did is collect information from news articles, and the government did produce the police reports that we reference in discovery, which Judge Carney relied on as evidence that the U.S. Attorney's Office knew about, specifically these three people. Ms. Flark, Your Honor, is the head of By Any Means Necessary, which is in the district court order, but because she's not in this district, we chose to focus, after the government made that point, on JF, JA, and JMA. I have a discriminatory effect question with regard to JA, JF, and JMA. Yes, sir. I don't know that the appellee's brief confronts seriously the difference in criminal history between your clients and these three persons. And so my question really is a two-part question. And the first is, do you acknowledge that there is a substantial difference in the criminal history of those persons? And the second is, if there is a substantial difference, why isn't that by itself enough for us to conclude that the district court order should be reversed because it defeats a finding of substantial similarity? And I know you're not going to agree with me on that point, so then the follow-up to that would be, is there a case you think I should read that would help me come out your way? So, Your Honor, I'm not disputing that criminal history is a relevant consideration for charging determinations writ large. In this case, I will first start on a factual ground that one of the three, I believe it's JF, does have a prior conviction for something related to rioting. So my client, Mr. Rundo, has one prior conviction. I understand it's not for rioting. It's also from when he was a teenager. He was never arrested until the Berkeley protest between his original conviction and this case. And then all of his other arrests have to do with these indictments, right? So JF, I think it was JF, it's one of the three Js, has a prior conviction that's in the police report. He was an adult when he committed the stabbing we're talking about, wasn't he? He was. He was a teenaged adult, Your Honor. Yes, well, you keep saying teenage, and I just wanted to make it clear. Yeah, I think the behavior of a 19-year-old is different than the behavior of a 30-year-old. And there's all the social science that we all know about that speaks to that. But I would argue, and if I could ask the Court just to review three factual things before rendering your decision, it would be the three police reports of JA, JMA, and JF, which are the first three exhibits in Volume 5 of the government's ERs. Because if you read them carefully, these people all were armed. They were all armed with pepper spray. They all used pepper spray, and they all used their fists. Pepper spray, right? One of them had a knife as well. They didn't carry a firearm, right? No, none of them had guns. But one of them had a knife, Your Honor, that they found when they arrested him. And so these three people are doing the same things. They're using their fists and using pepper spray, which is arguably worse as our clients. Do the police reports say that they used their fists? Yes, all three of them. Okay. And all three of them were cited not only for inciting a riot, but for battery and also illegal use of tear gas. Battery might only be two of them, but it's certainly these three comparators. Were they arrested for inciting a riot? I don't recall that. Yes, all three of them were arrested. Under California law. Correct. Not under the anti-riot. That's exactly our point, Your Honor. They were all arrested for inciting a riot, and this case is the only case, along with its companion case in Virginia, where anyone was charged federally with the anti-riot act based on political protests in 2017 or 2018. And this is what I really want to say, Your Honors, if I may. This case is about viewpoint discrimination. It's about two groups who have differing viewpoints. By the way, the fact that these three people are anti-Trump and anti-fascism is in the police reports, contrary to my colleague's suggestion. Forgive me. I know that's your argument. I respect that. But in this case, the government points to evidence that, from a layperson's perspective, we'd say, wow, this one is a highly organized, almost mafia-like organization. They recruit people. They train people. They go with the intention of hurting people. Indeed, Mr. Rundo was interviewed by a, I guess I'll call him a reporter, and he suggested that he should be quoted as saying that they went with the intention to hurt people, and then they put it online. The other folks that you talk about, okay, they were arrested. If I may, Your Honor, the police report says that they found that, I believe it's JF, but it's one of the three Js, intended to commit violence at the rally before they went. It's exactly the same. Based on what? Based on their interview of the person when they got. Of that interview? Yes. All this information comes from the three police reports, Your Honor. So it's all just there. And the other thing is JF, in his police report, also says he organized a group of people to attend this event, and he didn't just say they communicated about it. He contacted them. Contact in this day and age is sufficient to show the use of a wire or the Internet. There is no way to contact someone. It's a super reasonable inference to say that if you contact someone in this day and age, you have used a commerce element. Can we infer that? I think my colleague had just asked that before. Can we infer that a medium of interstate commerce was used? Well, you don't have to infer it, Your Honor, because Judge Carney found it. So all you have to do is review his. It's based on an inference, right? Well, it's based on the police report where JF says, I contacted several people before we came. Okay. They may have met at a Rotary Club. That's not a contact, is it? I mean, contacting. But the bottom line is one of the things that our panel wrestles with is the evidence. Yes. Judge Carney cited hundreds of news articles. There's no foundation for them at all. Well, that's the evidence we provided to Judge Carney, Your Honor. But bottom line is he based his orders on that kind of evidence. That's what we're struggling with here. Your Honor, he also based it on the three police reports that the government provided to us in discovery that we are relying on for the three Js who are the similarly situated people. They intended to commit violence. They were armed with pepper spray. They used the pepper spray. They used their fists. In terms of the organization of RAM, I would also like to add these. Let me ask you this. By your perspective, do the police reports show that the pepper spray was used as a defensive mechanism to basically back up people who were attacking them? Because that's what I read. It actually finds the opposite, that it was not used in self-defense. And that's a quote. Not in self-defense is in the police report. That's what the law enforcement officers who were there concluded. And that's probable cause. So we would really, really ask you to review the police reports because they very much support Judge Carney's factual findings that these three people were similarly situated. In terms of RAM's supposed organization, this is a tiny group that had just started that year. They did not have a huge social media following. This is all in the record. And the RAM guidelines that the government loves to cite, it's 4ER550. These were found, and this is in Antony Best's declaration to the district court at paragraph 3. Those were found on Daly's computer. They were not published. There was no website. There's no evidence that anyone else except Ben Daly, he's a Virginia defendant, ever saw it. Can I ask you this, counsel? Does the defense agree that the comparators that Judge Carney used other than JAJF or JMA don't make it under our case law? Do you agree with that? The three individual humans are the only individual human comparators. So basically you agree. The three J's. That's what we have to look at. Because the conduct of these three individuals, you refer to the police report with respect to them, but with respect to the woman that was also charged by the Sacramento DA and so on. By any means necessary. The groups and all the other things. We ignore that, right, for purposes of this analysis? I think because of the venue issue, we chose to focus further on the three individuals where the government agreed that there was venue here, which is the three J's. That's the strength of your case, right? Yes. Those three individuals. That is the most important part of our case. That and the discriminatory intent of the government, Your Honor. This all goes to a back. What is the evidence of discriminatory intent that you presented to Judge Carney? The evidence of discriminatory intent that we presented to Judge Carney had to do with I want to say this again. I said it earlier. This is a case about viewpoint discrimination, not content discrimination or the First Amendment. This is the only case of any of the cases cited that has presented a claim of viewpoint discrimination where you have two opposing viewpoint-holding people who have done the same thing at the same time and place under this court's decision in Bourgeois. That is an appropriate time frame. And under this court's decision in Aguilar, as we've talked about at length, it's the right definition for similarly situated. So we would ask you to look at Aguilar and Bourgeois. The evidence of intent is that there are two viewpoints that law enforcement knew about because we have the law enforcement bulletins that say Antifa and the far-right actors. Aren't these two offices fighting with each other on appeal? With regard to a selective prosecution discovery case in which the government is alleged to have selectively prosecuted left-wing protesters? Under Bourgeois, that case is not relevant, Your Honor. That's from 2020, and the George Floyd protests were all people with one viewpoint. So like the Chicago 7 or like January 6, those are a homogenous group of protesters protesting one thing, whether police violence or the election or the Democratic National Convention in 1968. All of the protesters have one viewpoint. Here, we have two viewpoints. That is why this is the case about viewpoint discrimination, and that is the evidence of intent along with the statistics, Your Honor. Since it's your burden, as you know, there's a presumption in favor of the government on this. Is it your view that if you were the government prosecutor, that you could have successfully indicted and convicted J.A., J.F., and J.M.A. of violation of the Riot Act based on the evidence that was presented to Judge Carney? Yes. Really? I think they could have indicted them. I mean, this is the other problem that the case has noted, is that we don't have access to criminal history databases and law enforcement and the FBI. Based on the evidence that was presented to the district court, it's your view that if you were the government, that you could have successfully convicted those three individuals of violations of the Riot Act. As I said, Your Honor, our position is they could have indicted them. They hadn't yet investigated them, so the federal government doesn't yet have the evidence that we need, just like they didn't have the evidence against Mr. Rondeau here. So you would go for selective enforcement instead of selective prosecution? I can't speak to our litigation determinations. It's a whole different deal, but it seems like you're arguing for selective enforcement. I'm not, Your Honor. I'm arguing for selective prosecution. These three individuals could have been indicted under the Anti-Riot Act by the United States Attorney's Office for the Central District of California. Successfully prosecuted. Yes. If they had done the kind of investigation into them that they did into my client, they could have gotten a prosecution. They did the exact same thing, and they coordinated in advance. They intended to commit violence. That's what the police found. So it's not about the police not enforcing it. It's about this United States Attorney's Office only charging one Anti-Riot Act case up until 2018 in 50 years. That is evidence of discriminatory intent. Specifically because this is a viewpoint discrimination case, Your Honors, none of the others have to do with opposing viewpoints doing the same thing at the same place and time, which under Aguilar and Bourgeois is how we show discriminatory effect. And the viewpoint discrimination is discriminatory intent on behalf of the government. I think, Your Honor, it would be a lot harder for us to make this claim if they had left all the allegations of white nationalism out of the indictment, the press release, the first sentence of the blue brief in this court. Isn't that just evidence of motive? Motive is not an element, Your Honor. No, but it's a reason to prosecute people. You can go to court. I beg your pardon. You can go to court and you can show the jury that the person had a motive to do it. It makes it more likely you can get a conviction. So this is another point I wanted to make, Judge Steiger. It may be that all of my clients' protected speech, like the after-the-fact tweets and whatnot, were evidence. Protected speech can be admissible evidence. It cannot be the basis for the government to select to prosecute you. That's why it's protected speech. So we're not saying we would have moved to exclude it, but if they hadn't highlighted their viewpoint discrimination against imputed white nationalists, we wouldn't have the evidence of intent. But it's everywhere in this case, both statistically and in the government's conduct and wording choices throughout this litigation from 2018 to the blue brief to this court. Viewpoint discrimination is different. Let me ask my colleague whether either has additional questions. I know. Thank you, Judge Smith. All right. We know we could talk about this for a long time, but thank you for your argument. Thank you very much, Your Honor. We respectfully ask the court to affirm Judge Carney. Thank you very much. Thank you. Mr. Robbins, you have some rebuttal time. Thank you, Your Honor. I want to pick up where Judge Smith left off, which is that this is a selective prosecution case, not a selective enforcement case. The question is, based on what the government had in front of it at the time it was making its charging decision, and we can have a lively discussion all day about charging decisions and which factors matter, pepper spray versus organization, MMA training, multiple riots, but those are discretionary prosecutorial considerations. That's what AUSA is, and that's what the U.S. Attorney's Office takes into account and tries to figure out before indicting someone. That's not a constitutional violation. If we had come out the other way and indicted the three potentially Antifa members instead of these two defendants because they used pepper spray, we'd be right back here having the same conversation, or at least in front of a different district judge, if that judge did the same thing Judge Carney did. We'd have the same problem. The government simply cannot prosecute politically motivated violence with really both left and right hands tied behind our backs, where the only option, apparently according to the defense, is that we impose some sort of ideological quota on a given statute, on a given riot, on a given indictment, because then we would be picking people we wouldn't otherwise prosecute based on their viewpoint, which actually would violate the Constitution. It's like this is not a functional system that the defense is proposing here. And the Wilson case really is relevant because I argued it in Courtroom 2, I guess, a month ago, and it's the same binder. I used the same red weld because all the cases were the same, because all the law was the same and the issues were the same. It does matter. And it is, first of all, not true that our office is selectively prosecuting anyone, and second of all, it is somewhat absurd that we are having to defend sort of two different political directions, our attempt to keep the public safe from politically motivated violence. Counsel, as you know, your able opponent tries to frame this as a viewpoint discrimination case. Would you share with the Court your view about what role, if any, the presumption that the government's case has under our case law, our Supreme Court case law, has in responding to that, if any? I think it's very important. I would point this Court to Armstrong and Sellers discussing Armstrong and making that distinction between the selective prosecution and enforcement. The bar, the strong presumption, because of separation of powers concerns, because it is the U.S. Attorney's Office's job to weigh all these considerations to figure out who to charge, there's a strong presumption that the government is acting lawfully and legitimately, and that presumption hasn't come close to being overturned here. And just to connect it to the standard review point really quick, I see my time's expired. The Cullithan case not only addresses a sort of clear error issue, but also says that the facts are construed in favor of the government, and it says in the case of ambiguous discrimination, it's not based on who won or lost below, because that is what's consistent with the Armstrong standard, with that strong presumption that the government is acting legitimately. I wanted to get your view on that because your able colleague raising the viewpoint discrimination, it seems to me it's almost impossible to cabin that because if you have any kind of political dispute, unfortunately we live in an age when that's very common, that it would be almost impossible to prosecute anybody because someone could say, well, they're doing it because of viewpoint discrimination, and where do you go from there? I think that's absolutely correct. I think that the logic of the district court here, the district judge here, if followed nationwide, would make it effectively impossible for us to prosecute politically motivated violence. Just let me ask one last question. So counsel just argued that you could have prosecuted these other individuals, the J persons, for violations of the Anti-Riot Act. What's your response to that? Yeah, could I join in Judge Paz's question and also to ask you to respond briefly to the point that if we just read the three police reports more closely, it comes out the police way. So I think, again, looking at what the administration and government had, no, I don't think we could have, I don't think we met the probable cause standard to bring charges against the three, JF, JA, and JMA. But even if that's in some dispute, right, maybe even if it's debatable, we could have brought a complaint knowing that we would not meet the reasonable doubt standard. Obviously the potential for success at trial under common sense as well as ethics and the department's guidelines and the weight case in terms of the strength of the evidence is a major consideration when it comes to what cases the government is going to bring. So the probable cause argument that defense makes that we should just be indicting people with probable cause when we can't convict them is wrong. So from your perspective, your opposing counsel's comment and argument that the three individuals should have been charged, could have been convicted, is just wrong? Is that your perspective? That is wrong, and I think that is wrong. Can I take that question just a little bit further? Of course. What is the essential element or factual predicate that would be missing from any anti-riot act charges against the Jays? The first of the two elements, the use of interstate facilities slash communication in furtherance of the riot, the planned riotous act. Now, again, this is the selective enforcement versus selective prosecution issue. If the defense wants to say, you know, you should investigate this more, that's a separate claim. The claim here is based on what we knew, we should have charged this case. That's a separate enforcement issue, right? Correct. That's simply wrong. We should not have charged this case. I don't think anyone seriously thinks that we should have charged this case based on the evidence we had. And that alone, as Judge Tiger pointed out, just one difference, much less such an important difference as that, is enough to take this out of the discriminatory effects bucket. I gave the court six, I think, when I was up here, but this is not an analysis where we look at all different considerations and sort of net out and decide, you know, which one is more important than the others. They have to be similarly situated in all relevant respects. If even one of those is different, then that just goes to the government's discretionary charging decisions as to whether pepper spray or MMA combat is more important of a consideration. All right. Any other questions about my calling? No. With that, Your Honor, we'd ask the court to reverse the judgment below and send this case back so that these defendants can be tried before a jury. Thank you. Thank you. Thanks to all the counsel. We appreciate it. It's very helpful to the court to have such able counsel helping us in our deliberation. The court stands adjourned for the day. By the way, the case is submitted. All rise. This court for this session stands adjourned.
judges: PAEZ, SMITH, Tigar